# EXHIBIT C

**Ying Sun Affidavit**

I, Paul K. Craine, declare and state as follows:

1.      I have over three decades of law enforcement experience both domestically in the United States and internationally. From 1990 to 2017, I served as a Special Agent with the Drug Enforcement Administration (DEA) serving in both domestic offices as well as foreign assignments. Prior to joining the DEA, I served as a Police Officer and Narcotics Detective for the Fulton County Police Department in Atlanta, Georgia from 1984 to 1990. I have a bachelor's degree in computer information systems from Georgia State University (1987). I have completed numerous training and post-graduate programs including (1) the University of Notre Dame – Mendoza College of Business Senior Executive Development Program, (2) the Executive Law Enforcement Development Program at Johns Hopkins University, (3) the DEA Special Agent Academy, (4) the DEA Supervisory Special Agent Academy, and (5) the North Georgia Law Enforcement Academy.

2.      As part of my law enforcement career, I received extensive training in conducting complex, multi-jurisdictional investigations both foreign and domestic. I am trained in reviewing intelligence sources and data, critically evaluating evidence, and cross-checking and corroborating information from a variety of different sources. I have applied the same methodology and principles I was taught, and learned, as a DEA Special Agent and law enforcement officer to develop and validate my conclusions in this Affidavit.

3.      I have received multiple prestigious law enforcement awards in recognition of my exemplary work, achievement, and professionalism related to my participation and supervision of international investigations which resulted in the arrest and prosecution of some of the leaders of the most dangerous and notorious international criminal and drug cartel organizations.

**Ying Sun Affidavit**

4.      Since my retirement from the DEA, I have functioned as a Senior Executive Level security and law enforcement consultant to major U.S. and foreign-based corporations. In this capacity, I utilize my knowledge and expertise to mitigate significant safety, security, and other sensitive matters in the U.S. and internationally.

5.      I am a subject matter expert within the private sector concerning matters of the Office of Foreign Assets Control (OFAC), Anti-Money Laundering (AML), Bank Secrecy Act (BSA), and other compliance-related issues.

6.      I am also a recognized expert on Transnational Organized Crime (TOC) and Counterterrorism (CT).

7.      I am regularly requested to provide expert presentations at law-enforcement conferences on the topic of Mexican cartels and organized crime in Mexico. My presentations include, but are not limited to, discussions of international money laundering, Drug Trafficking, narco-terrorism, and other geo-political issues.

8.      I have previously testified and provided sworn statements as an expert witness in U.S. Federal Court on matters related to Mexican, Venezuelan, and Colombian drug trafficking organizations.

9.      My first assignment as a DEA Special Agent was to the McAllen, Texas office. I served as a DEA Special Agent in McAllen, Texas between 1990 and 1997 where I conducted complex investigations targeting the highest-level drug cartel leaders and their criminal associates operating along the U.S.-Mexico border.

10.      During this period of my career, I began to acquire in depth and detailed knowledge of Mexican drug trafficking organizations, their modes, and methods of operations, as well as their

**Ying Sun Affidavit**

historical development from local organized crime groups to regional, national, and international drug-trafficking organizations.

11.     In 1997, I was reassigned to the DEA office in Bogota, Colombia. During my tenure in Bogota, which lasted until 2000, I worked on numerous U.S. investigations targeting drug cartels and drug-trafficking organizations based in Colombia. These Colombian organizations coordinated closely with Mexican drug cartels to transport hundreds of tons a year of cocaine, marijuana, and heroin from Colombia to Mexico and the United States.

12.     I was the lead investigator on several investigations targeting Colombian-based drug cartels and their criminal alliances with Mexican drug cartels. The investigations focused on these organizations' illicit cocaine production, money laundering, and the trafficking in drugs and arms.  I also directed and supervised a joint U.S.-Colombian Special Investigations and Operations Group that targeted and investigated high-level drug cartel leaders and criminal associates operating in Colombia with connections to the Mexican cartels.

13.     Through the review of thousands of hours of judicially authorized intercepted telephone conversations, much of which contained in-depth discussions between Colombian and Mexican cartel leaders about their joint criminal enterprises in Colombia, Mexico, the United States and Latin America, I gained an extensive understanding and knowledge about the inner workings of these cartels.

14.     From 2000 to 2012, I served as a Supervisory Special Agent in managerial positions within the DEA in Houston, Texas, and Northern Virginia. In this capacity, I directed and supervised sensitive, complex operations and investigations regarding money laundering, drug trafficking, and the financial operations of Mexican, Colombian, and other transnational organized crime organizations including, U.S. designated foreign terrorist organizations.

**Ying Sun Affidavit**

15.     From 2003 to 2008, I oversaw the DEA Special Operations Division Narco Terrorism Section wherein I established and was the first Director of the Counter Narco-Terrorism Operations Center (CNTOC). CNTOC coordinates all criminal investigations and operations for the DEA targeting Narco-Terrorist organizations, and their connections to other organized criminal groups and drug cartels.

16.     From 2008 to 2012, I was assigned as the Assistant Special Agent-in-Charge of the Houston Organized Crime Strike Force. The Strike Force was comprised of Special Agents from the DEA, FBI, HSI, ATF, IRS, and the U.S. Marshals Service. The Strike Force's mission was to target, disrupt, and dismantle the most significant Mexican Cartels affecting the security of the United States and its citizens.[1]

17.     During my tenure in-charge of the Strike Force, I supervised and directed significant federal investigations targeting the leadership and infrastructure of the Juárez, Gulf, Sinaloa, Zeta, Beltran Leyva, and La Familia Mexican cartels. Many of my investigations led to U.S. federal charges being issued and the arrest and extradition of members and leaders of the cartels to the United States for federal prosecution.

18.     During this period, I also supervised a complex investigation related to a United States based Iranian Proxy. The proxy conspired to coordinate, and execute, a significant terrorist act in Washington D.C. targeting high level foreign diplomatic officials stationed in D.C. This investigation led to the arrest and prosecution of the Iranian Proxy under the United States Anti-Terrorism statutes, 18 U.S.C. § 2331, *et seq*.

---

[1] *See* June S. Beittel, Congressional Research Service, "Mexico: Organized Crime and Drug Trafficking Organizations", July 28, 2020, R41576 ("Mexican drug trafficking organizations (DTOs) pose the greatest crime threat to the United States").

**Ying Sun Affidavit**

19.     My last assignment with the DEA was from January 2013 to July 2017. During this time, I was the DEA Special Agent-in-Charge and Regional Director for North and Central America posted at the U.S. Embassy in Mexico City. In this position I directed and managed investigations and enforcement operations for twenty separate DEA offices located throughout Mexico, Central America, and Canada. My duties involved managing and supervising sensitive and sophisticated international narcotics and money laundering investigations related to, among other matters, Mexican drug cartels.

20.     As Special Agent in Charge and Regional Director for North and Central America, I also served as the main advisor on international drug trafficking and money laundering to the United States Ambassadors in Mexico, Canada, Belize, El Salvador, Guatemala, Honduras, Costa Rica, Nicaragua, and Panama.

21.     During my career as a DEA Special Agent, I participated in and supervised hundreds of complex federal criminal investigations targeting foreign based drug-trafficking and money laundering organizations. Many of these investigations resulted in charges being brought in U.S. federal courts, the arrest and extradition of foreign nationals to the United States for prosecution, and the seizure of drugs and assets that were purchased with the proceeds of drug trafficking and other illegal activities.

22.     I have personally interviewed and debriefed hundreds of persons who were long term members of Mexican drug cartels. These individuals included leaders from the highest level of the organization to members in-charge of illegal drug transportation, international money laundering, kidnapping, corrupting public officials, torture, and murder of rival members and innocent persons.

## Ying Sun Affidavit

### Short History of the Evolution of Drug Cartels in Mexico

23.     For much of the last 50 years, Mexican organized crime and drug trafficking has been controlled by hundreds of local and regional criminal groups spread across Mexico with varying sizes of membership and areas of geographical control. These groups are generally familial based, and the majority of these groups maintain consistent long-term control over their geographical areas of influence. In the late 1970's, several regional drug-trafficking groups based in the Mexican states of Sinaloa, Jalisco, Sonora, and Durango agreed to combine and coordinate their efforts to take advantage of the growing demand for illegal drugs in the United States, the increasing supply of cocaine available from the Medellin Cartel in Colombia, and their ability to corrupt Mexican government officials at the local, state and federal levels to allow them to conduct their drug-trafficking operations without interference from police or other government officials.

24.     In the 1980's, Miguel Angel Felix Gallardo, a.k.a. El Padrino, formed an alliance of drug traffickers known as The Federation[2], and it included the leaders of the most significant Mexican drug trafficking groups. The Federation was designed for regional traffickers to work together to coordinate drug shipments into the U.S. and lessen conflict.[3]

25.     The two largest factions that developed from the Federation were the Sinaloa Cartel led by Felix Gallardo (and later Juan Jose Esparragoza Moreno (a.k.a. "El Azul"), Joaquín "El Chapo" Guzmán, and Ismael "El Mayo" Zambada) and the Juárez Cartel led by Amado Carrillo Fuentes. The Sinaloa and Juárez Cartels grew to control the majority of the cross-border drug trade into the United States.

---

[2] This group has also been known as the Guadalajara Cartel.
[3] The Federation, which would eventually break down into separate cartels including the Juárez Cartel and Sinaloa Cartels, is discussed in all the major U.S. and Mexican studies of the history of the Mexican drug trade.

**Ying Sun Affidavit**

26.     These coordinated efforts, coupled with the Federation's monopoly on the transportation of Colombian cocaine through Mexico, resulted in billions of dollars of annual revenue.

**History of the Juárez Cartel**

27.     The Juárez Cartel is one of the oldest and most powerful criminal organizations in Mexico. Since its beginnings, the Juárez Cartel has focused on drug trafficking, but it has since expanded into other criminal activities such as human trafficking, kidnapping, and extortion. As part of this expansion, a new armed wing of the Juárez Cartel—La Línea— emerged.[4]

28.     "On June 1, 2004, the Carrillo Fuentes Organization (a/k/a CFO; a/k/a Juárez Cartel) was listed as a significant foreign narcotics trafficker under the Foreign Narcotics Kingpin Designation Act[, and o]n December 15, 2001, the U.S. Department of the Treasury further clarified the scope of designations against the Cartel to expressly incorporate an additional alias of the Juárez Cartel, 'La Linea.'"[5]

29.     The origins of the Juárez Cartel as an independent criminal enterprise date back to the 1980s, when the Ciudad Juárez area was under the control of Rafael Aguilar Guajardo, Pablo Acosta, and Amado Carrillo Fuentes who worked closely with the leadership of The Federation. After the arrest of Miguel Ángel Félix Gallardo (the Godfather) of the Federation in 1989, the different regions comprising the Federation quickly splintered into separate regional cartels competing for control of territory and profits. Rafael Aguilar Guajardo and Amado Carrillo Fuentes became the heads of the newly formed Juárez Cartel.

---

[4] https://www.borderlandbeat.com/2020/04/who-is-la-linea.html
[5] *Howard J. Miller, et al. v. Juárez Cartel*, 2022 WL 2286952, at *2 (D.N.D. June 24, 2022) ("Plaintiffs' Judgment") (internal citations and quotations omitted).

**Ying Sun Affidavit**

30.     Eventually, the Juárez Cartel, under the leadership of Amado Carrillo Fuentes, would rapidly reconstruct the cooperation and coordination of a large part of the original Federation of drug traffickers to include the Sinaloa Cartel and grow to control the majority of all Mexican drug trafficking operations and extended the Juárez Cartel's operational control to the Mexican states of Sinaloa, Durango, Jalisco, Coahuila, Zacatecas, Michoacán, Colima, Nayarit, Oaxaca, Guerrero, Veracruz, Chiapas, Campeche, Yucatán, Quintana Roo, Puebla, Morelos and México City.

31.     Collectively, the restructured and coordinated group would become collectively known as the "Sinaloa Cartel." [6]

32.     The main leadership of the Sinaloa cartel in the mid to late 90's was Chapo Guzman, Ismael "Mayo" Zambada and his brother, Ray Zambada, the Beltran Leyva brothers, and Ignacio "Nacho Coronel". The leaders of the Juárez and Sinaloa cartels were more than just business partners; they were also family. Ismael Zambada (Mayo) was the godfather to Amado Carrillo Fuentes's son, and El Mayo named his son after Amado's brother Vicente (and eventual leader of the Juárez Cartel). [7]

33.     The relationship between the Juárez and Sinaloa Cartel fissured in 2003/2004 after Amado Carrillo's brother Rodolfo ordered the murder of two close associates of Chapo Guzman who were moving unauthorized loads of illegal drugs through the Juárez Cartel area of control without coordination or paying the tax for crossing through their area.

---

[6] *United States v. Joaquin Archivaldo Guzman Loera,* Testimony of Jesus Zambada Garcia, Tr. 824:15 (E.D.N.Y. Nov. 15, 2018); *see also United States v. Genaro Garcia Luna,* Testimony of Tirso Martinez Sanchez, Tr. 261:7 (The Sinaloa and Juárez Cartel were "one in the same.") (E.D.N.Y. Jan. 24, 2023).
[7] *Id.,* Testimony of Vicente Zambada Niebla, Tr. at 3977:15, 3978:1-2.

**Ying Sun Affidavit**

34.     In retribution for the killing of his associates, Chapo Guzman orchestrated the murder of Rodolfo and his wife as they were exiting a movie theater in Chihuahua. These events resulted in significant battles between the Juárez and Sinaloa Cartels.

35.     After Amado Carrillo's death in 1997, because of a botched plastic surgery operation, the Juárez cartel was forced to reorganize under Vicente Carrillo the brother of Amado.

36.     After the death of Amado there was infighting between the Juárez and Sinaloa Cartels at the same time the Sinaloa Cartel was at war with the powerful Arrellano Felix Cartel for control of the Mexican Pacific drug corridor. Over the next decade there were constantly changing alliances between the major Mexican cartels to prevent takeovers of important trafficking corridors. In June 2011, the Juárez Cartel distributed signs and messages in the state of Chihuahua announcing an alliance with the Los Zetas Cartel, for their assistance in the fight against the Sinaloa Cartel.

37.     Even during the ensuing years from 2011 to 2019, while the Juárez and Sinaloa Cartels were at odds, elements of the Juárez and Sinaloa cartels worked together to coordinate drug trafficking and other illegal activities.

**Miller, LeBaron and Langford Families Massacre**

38.     "On November 4, 2019, members of the Juárez Cartel and its violent wing, La Línea ("The Line"), ambushed three women and fourteen children, murdering six of the children and their mothers in the Sierra Alta in Sonora, Mexico. All of the people ambushed were United States citizens."[8]

39.     Shortly prior to the November 4, 2019, massacre, meetings were held at a ranch in Buenaventura, Chihuahua. Present at these meetings were representatives of Rafael Caro Quintero

---

[8] Plaintiffs' Judgment at *1.

## Ying Sun Affidavit

and Mayo Zambada, (leaders of the Sonora and Sinaloa cartels), as well as high ranking members of La Linea/Juárez cartel and the leaders of several other regional criminal groups. "During the planning process, the order was given to shoot at anyone, be it a civilian, police officer, just anyone."[9]

40.     At these meetings, the coordination of efforts between La Linea, Sonora, and Sinaloa Cartels (collectively referred to herein as the "cartels") was discussed, and it was decided that the artels would combine and coordinate attacks against a regional criminal group which controlled the area around Agua Prieta, Sonora, and an associated group in the area of San Miguel, Bavispe. Both groups were constantly battling with the cartels for this territory due to its strategic importance – proximity to/on the United States/Mexico border.

41.     As a result of these meetings, the participating representatives including the leaders of Sinaloa Cartel (Mayo Zambada) and Sonora Cartel (Rafael Caro Quintero) agreed to provide the Juárez Cartel with material support to include, but not limited to, manpower and heavy weaponry such as 50 caliber rifles to support a series of coordinated attacks in Sonora and the massacre that resulted in the murder and attempted murder of the Plaintiffs.

42.     "The evidence shows that on November 3, 2019, over 100 heavily armed members of La Linea gathered at a ranch located between Janos and Ascension, Chihuahua, belonging to the leader of the criminal organization known as La Línea or the Juárez Cartel."[10] The evidence also shows that representatives for Rafael Caro Quintero and Mayo Zambada were present for, and involved in, this gathering at the direction of Caro Quintero and Zamabada.[11]

---

[9] Plaintiffs' Judgment at *3 (citing Trial Testimony of Enrique Baeza 108:1-4).
[10] *Id.*; *see also* 2020-07-29 Fabio Padilla Cruz Interview, pages 10 and 19.
[11] 2020-07-29 Fabio Padilla Cruz Interview, pages 10 and 19.

**Ying Sun Affidavit**

43.     It was during the morning hours of November 4th, that Juárez "Cartel assassins", armed with weapons supplied by the Sinaloa and Sonora Cartels, "killed Maria Rhonita LeBaron and her four children, twelve-year-old H.M. Jr., ten-year-old K.B.M., and eight-month-old twins T.A.M. and T.G.M. Rhonita and her four children were *alive and conscious* when their vehicle was most definitely *intentionally* set on fire" by the assassins.[12] "The Cartel also killed Christina Langford and Dawna Ray and her two children – eleven-year-old T.L. and two-year-old R.L. Those injured in the attack include[d] F.M.J., K.L., D.L., M.L., C.L., J.L., X.L. and B.L."[13]

44.     Based upon my review of the evidence, my education, training, and experience, it is my opinion that while the Juárez, Sinaloa, and Sonora Cartels may at times be adversaries fighting for territory; leadership elements of the cartels also regularly work together as evidenced by the extensive involvement of the Sinaloa and Sonora Cartels in the planning and execution of the attacks on November 4 , 2019, that resulted in the Plaintiffs massacre.

45.     Los Bournes, Los Nuevos Aztecas, Los H, and Fuerzas Especiales Mexicles, are various street/prison level gangs associated with La Línea to help it control its territory, in the in the Mexican State of Chihuahua and the border city of Ciudad Juárez.[14] La Línea, however, receives material assistance (financial, technological, goods, and services) in furtherance of its international narcotics trafficking activities as well from the Cartel Jalisco Nueva Generacion

---

[12] Plaintiffs' Judgment at *1 (internal quotations and citations omitted) (emphasis in original).
[13] *Id.*
[14] Los Bournes - http://www.borderlandbeat.com/2021/06/notable-figures-la-linea-part-ii-sonora.html?m=1; Fuerzas Especiales Mexicles -http://www.borderlandbeat.com/2019/06/explosion-of-violence-from-mexiclesvs.html;
Los Nuevos Aztecas, or Barrio Azteca - http://www.borderlandbeat.com/2009/11/barrio-azteca.html;
Los H - http://www.borderlandbeat.com/2018/09/narcos-control-chihuahuas-sierra.html

**Ying Sun Affidavit**

(CJNG).[15] which is "one of the largest, most dangerous drug cartels currently operating in Mexico".[16]

46.    Clan Zheng, a.k.a. Zheng network a.k.a. Zheng Drug Trafficking Organization Control, has been designated a "kingpin" organization pursuant to the Foreign Narcotics Kingpin Designation Act.[17] The Sinaloa and CJNG cartels work together to source their illicit narcotics from, and lauder their illicit moneys through, Clan Zheng.[18] Thus, Clan Zheng performs vital functions for each cartel, which cannot be easily replaced; therefore, the group—Clan Zheng, Sinaloa, and CJNG cartels—work together in furtherance of their illicit enterprises.

**Conclusion**

47.    The Juárez Cartel remains one of the most powerful criminal organizations in Mexico.

48.    Significantly, within the past few years, the Juárez Cartel has also allied itself with elements of the Cartel Jalisco Nueva Generacion for support and protection in its continued fighting with groups allied against the Juárez Cartel.

---

[15] https://www.infobae.com/america/mexico/2021/04/16/alianza-contra-el-cartel-de-sinaloa-confirmaron-queel-cjng-y-la-linea-se-unieron-en-chihuahua/ ("Although the Jalisco Nueva generación Cartel (CJNG) does not have an established base in Chihuahua, state authorities confirmed that the criminal group has formed operation networks with La Linea") (translated from Spanish to English); http://www.borderlandbeat.com/2021/04/ciudad-Juárez-chihuahua-alliance.html (Chihuahua State Secretary of Public Safety confirms alliance between La Linea and the Cartel Jalisco Nueva Generacion); https://www.youtube.com/watch?v=IICxJbTUhEE&feature=youtu.be.

[16] United States Department of Justice, Press Release, Oct. 16, 2018, "Justice, Treasury, and State Departments Announce Coordinated Enforcement Efforts Against Cartel Jalisco Nueva Generacion." Available at https://www.justice.gov/opa/pr/justice-treasury-and-state-departments-announce-coordinated-enforcementefforts-against

[17] https://home.treasury.gov/news/press-releases/sm1063

[18] https://heraldodemexico.com.mx/nacional/2019/12/30/los-zheng-cartel-chino-que-opera-distribucion-defentanilo-en-mexico-142269.html; *see also* Lauren Greenwood and Kevin Fashola, "Illicit Fentanyl from China," U.S.-China Economic and Security Review Commission, Issue Brief, Aug. 24, 2021, https://www.uscc.gov/sites/default/files/2021-08/Illicit_Fentanyl_from_ChinaAn_Evolving_Global_Operation.pdf.

## Ying Sun Affidavit

49.      The Juárez, Sonora, Sinaloa, and CJNG Cartels regularly work together in furtherance of their illicit enterprises – they provide material support to each other to include, but not limited to, planning attacks, providing manpower and heavy weaponry, laundering money, and purchasing precursor chemicals to manufacture illicit narcotics. Such a partnership could not, and would not, occur in my opinion based upon my education, training, and experience, unless the highest leaders of each cartel gave explicit permission for such activity to occur. As such, it is my opinion, based upon my review of the evidence, my education, knowledge, and training, the Sonora, Sinaloa, and CJNG Cartels are agencies or instrumentalities of the Juárez Cartel.

50.      It is my opinion, based upon my review of the evidence, my education, knowledge, and training, that the interconnectedness of the Sonora and Sinaloa Cartels, coupled with the evidence of Rafael Caro Quintero's and Ismael Zambada's material support in planning and executing the attacks on November 4, 2019, that resulted in the Plaintiffs massacre, that Rafael Caro Quintero, the Sonora Cartel, and Ismael Zambada and the Sinaloa Cartel are agencies or instrumentalities of the Juárez Cartel.

### Ying Sun, Chinese Money Laundering and the Invaluable Service Provided to Mexican Drug Cartels.

51.      In May of 2021, a sealed criminal indictment was filed in the United States District Court in the Southern District of New York charging Ying Sun, Jian Wang, Frank Liu, Dielong Wu, Larry Lai, Jie Lin, and Steven Woo in a two (2) count indictment charging Conspiracy to Commit Money Laundering and Conspiracy to Operate an Unlicensed Money Transmitting Business.[19]

---

[19] *United States of America v. Ying Sun, et al.,* Case No. 21-cr-343, Doc. No. 2 (Indictment), (S.D.N.Y. May 24, 2021). Hereinafter referred to as the "Indictment".

**Ying Sun Affidavit**

52.     The Indictment alleges that the underlying Specified Unlawful Act (SUA) for the Conspiracy to Commit Money Laundering charge is that the Ying Sun Money Laundering Organization, and Ying Sun individually, "kn[ew] that the property involved in certain financial transactions represent[ed] the proceeds of … narcotics distribution and the conspiracy to commit the same, in violation of Title 21, United States code, Sections 841 and 846", and that the Ying Sun Money Laundering Organization, and Ying Sun individually, ***knew*** that these financial "transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i)."[20]

53.     In support of the SUA allegation, it is stated in the Indictment, by the DEA (in a press release) and by the United States Attorney's Office for the Southern District of New York (in a press release), that "[f]rom at least in or about April 2020 through in or about April 2021, Sun coordinated more than 130 completed Money Pickups involving a total of over $20 million in narcotics proceeds that took place in approximately 23 different states, including the Southern District of New York."[21] These states included, but were not limited to, "Arizona, California, Georgia, Maryland, New York, Ohio, Pennsylvania, and Tennessee."[22]

54.     When asked by the Court about the facts of the case, the Government stated:

> THE COURT: All right. Tell me more.
>
> MR. KALIKOW: With respect to the general substance of

---

[20] Indictment at ¶ 5.

[21] Indictment at ¶ 2; Drug Enforcement Administration, Press Release, *Seven Defendants Charged for Laundering Over $28 Million for DTO*, (July 21, 2021), available at https://www.dea.gov/press-releases/2021/07/21/seven-defendants-charged-laundering-over-28-million-dto; United States Attorney's Office, Southern District of New York, Press Release, *7 Defendants in Nationwide Money Laundering Organization Charged for Laundering Over $28 Million for Drug Trafficking Organizations*, (July 21, 2021), available at https://www.justice.gov/usao-sdny/pr/7-defendants-nationwide-money-laundering-organization-charged-laundering-over-28.

[22] Indictment at ¶ 8.

# Ying Sun Affidavit

this case, your Honor, this case stems from approximately one year and a half investigation into a money laundering organization operating throughout the United States that received millions of dollars in narcotics trafficking proceeds and laundered it on behalf of **Mexican drug cartels** and drug trafficking organizations based throughout the United States in at least 23 states.

I have spoken with defense counsel regarding discovery in this case. The discovery will be quite voluminous. It includes nine wiretaps, three pole cameras, approximately 95 observed money pickups that were conducted by the money laundering organization.

(Continued on next page)

MR. KALIKOW: (Continuing) Dozens of seizures of money, both from the defendants and others associates as well as from narcotics traffickers. Dozens of seizures of narcotics from those organizations. Phone records, location data, bank records, iCloud warrant returns, and the returns of two -- excuse me -- three search warrant -- let me strike that again. It was two premises search warrants, including one that resulted in the seizure of 28 cell phones.

The government has let defense counsel know we should be in a position to make our initial production of discovery material within the next approximately two weeks. However, in candor to the Court, I do expect that it will take at least one to two months to produce nearly all of the material, because of the fact that the investigation was conducted with local law

15

## Ying Sun Affidavit

enforcement agents in 23 different states.[23]

55.     "U.S. Attorney Audrey Strauss said: 'Like drug dealers, those who launder the proceeds of drug trafficking profit from the sale of dangerous narcotics that wreak havoc in communities throughout the United States. As alleged, the individuals arrested today facilitated drug traffickers by concealing millions of dollars of their ill-gotten profits. Our Office will continue to work closely with the DEA and our law enforcement partners to go after the money networks that are necessary to the operations of the international drug trade.'"[24]

56.     "DEA Special Agent in Charge Ray Donovan said: 'One of the most powerful criminal elements of transnational drug trafficking organizations is money laundering. Like any business, the ultimate gold of drug trafficking is to profit. These money laundering networks provide an invaluable service to traffickers, transferring their ill-gotten gains across the globe. The men and women of the DEA are focused on bringing to justice not only drug traffickers, but anyone who facilitates the drug trade.'"[25]

57.     The March 2021 publication of the DEA National Drug Threat Assessment, (NDTA) contained a map of the United States (Figure 58) Titled: Areas of Influence of Major Mexican Transnational Criminal Organizations by Individual Cartels.[26] This DEA work-product identifies Arizona, California, Georgia, Maryland, New York, Ohio, Pennsylvania, and Tennessee

---

[23] *United States of America v. Ying Sun, et al.* Case No. 21-cr-343, Doc. No. 53 (Transcript), 5:14-6:18 (S.D.N.Y. Sep. 30, 2021) (emphasis added).
[24] United States Attorney's Office, Southern District of New York, Press Release, *7 Defendants in Nationwide Money Laundering Organization Charged for Laundering Over $28 Million for Drug Trafficking Organizations*, (July 21, 2021), available at https://www.justice.gov/usao-sdny/pr/7-defendants-nationwide-money-laundering-organization-charged-laundering-over-28.
[25] *Id.*
[26] Drug Enforcement Administration, *2020 National Drug Threat Assessment*, (March 2021), available at https://www.dea.gov/documents/2021/03/02/2020-national-drug-threat-assessment.

**Ying Sun Affidavit**

(states wherein Ying Sun is alleged to have conducted an unlicensed money transmitting business

(money laundering)) as areas dominated by the Sinaloa and CJNG Cartels:



27

58.     In July of 2023, DEA Administrator Anne Milgram provided sworn testimony

before the Congressional Committee on the Judiciary – Subcommittee on Crime and Federal

Government Surveillance. As part of her Written Testimony, Administrator Milgram stated that:

> **Chinese Money Laundering Operations and the Sinaloa** and Jalisco
> Cartels utilize Chinese Money Laundering Organizations (CMLOs) in the
> United States and around the world to facilitate laundering drug proceeds.
> CMLOs use mirror transfers, trade-based money laundering and bulk cash
> movement to facilitate the exchange of foreign currency. The use of CMLOs
> by the cartels simplifies the money laundering process and streamlines the

---

27 *Id.*

17

**Ying Sun Affidavit**

purchase of precursor chemicals utilized in manufacturing drugs. These money laundering schemes are designed to remedy two separate issues: (1) the desire of Mexican cartels to repatriate drug proceeds into the Mexican banking system, and (2) wealthy Chinese nationals who are restricted by the PRC's capital flight laws from transferring large sums of money held in Chinese bank accounts for use abroad. To address these issues, CMLOs acquire U.S. dollars held by Mexican cartels as a means to supply their customers in the PRC.[28]

59.     On April 26, 2023, Anthony Ruggiero, Senior Director and Senior Fellow of the

Foundation for Defense of Democracies' Nonproliferation and Biodefense program, provided

Congressional testimony before the House Oversight and Accountability Committee concerning

how Chinese Money Laundering Organizations are of vital importance to the Cartels. During his

testimony Mr. Ruggiero stated that:

> Chinese money laundering organizations and individuals have emerged as a central element of a financial scheme that takes bulk U.S. dollars received from drug operations in the United States and returns the profits to cartels in Mexico. In 2021, Admiral Craig Fuller, then-commander of U.S. Southern Command, noted in testimony before Congress that Chinese money laundering is 'the number one underwriter of transnational criminal organizations.' In February 2023. Anne Milgram, administrator of the Drug Enforcement Administration (DEA), testified before the Senate Foreign Affairs Committee and emphasized that the use Chinese money laundering organizations 'by the cartels simplifies the money laundering process and streamlines the purchase of precursor chemicals utilized in manufacturing drugs.[29]

60.     Mr. Ruggerio also highlighted the U.S. Treasury Department's February 2022

National Money Laundering Risk Assessment which "noted that the Chinese money laundering

organizations are unique because they 'offer services at lower fees than traditional money brokers.'

---

[28] United States House of Representatives Committee on the Judiciary, Subcommittee on Crime and Federal Government Surveillance, *Drug Enforcement Administration Oversight,* Written Testimony of Anne Milgram (July 27, 2023), available at https://www.dea.gov/sites/default/files/2023-07/Administrator%20Written%20SFR%20July%202023%20%28Final%29.pdf (emphasis added).
[29] United States House of Representatives Oversight and Accountability Committee, Subcommittee on Health Care and Financial Services, *China in our Backyard: How Chinese Money Laundering Organizations Enrich the Cartels*, Written Testimony of Anthony Ruggiero (Apr. 26, 2023), available at https://oversight.house.gov/wp-content/uploads/2023/04/04-26-23-Ruggiero-Written-Testimony-FINAL.pdf.

**Ying Sun Affidavit**

The[se] organizations also 'provide insurance against losses, in that they will still pay out even if the funds are lost due to theft or interdiction by law enforcement.'"[30]

**Summary**

1.   From at least on or about April 2020 through in or about April 2021, the Ying Sun Money Laundering Organization, and Ying Sun individually, coordinated more than 130 completed Money Pickups involving a total of over $20 million in narcotics proceeds that took place in approximately 23 different states, including the Southern District of New York.[31]

2.   The underlying SUA for the charged Conspiracy to Commit Money Laundering charge alleges that the Ying Sun Money Laundering Organization, and Ying Sun individually, ***knew*** that the more than 130 completed Money Pickups, involving over $20 million dollars in twenty-three (23) different states, including but not limited to, Arizona, California, Georgia, Maryland, New York, Ohio, Pennsylvania, and Tennessee, were illicit narcotics proceeds.[32]

3.   The Ying Sun Money Laundering Organization, and Ying Sun individually, "received millions of dollars in narcotics trafficking proceeds **and laundered it on behalf of Mexican drug cartels** and drug trafficking organizations based throughout the United States".[33] The states that the Ying Sun Money Laundering Organization, and Ying Sun individually, conducted Money Pickups in are, according to the DEA, areas dominated by the Sinaloa and CJNG Cartels.[34]

4.   Chinese Money Laundering Organizations, such as Ying Sun's, are:

---

[30] *Id.*
[31] Indictment at ¶ 2
[32] *Id.* at ¶ 5.
[33] *See* note 23 *supra* (emphasis added).
[34] *See* note 26 *supra.*

**Ying Sun Affidavit**

 a. "One of the most powerful criminal elements of transnational drug trafficking organizations…. These money laundering networks provide an invaluable service to traffickers, transferring their ill-gotten gains across the globe."[35]

 b. A "central element of a financial scheme that takes bulk U.S. dollars received from drug operations in the United States and returns the profits to Mexico."[36]

 c. "[T]he number one underwrite of transnational criminal organizations" such as the Sinaloa and CJNG Cartels.[37]

**Conclusion**

1. The Ying Sun Money Laundering organization, and Ying Sun individually, operated on a massive scale with the ability to coordinate, conduct, and change in response to law enforcement presence, discreet and clandestine money pickups in 23 states, known to be dominated by the Sinaloa and CJNG Cartels, with large amounts of currency, utilizing encrypted communication systems and the ability to move the money rapidly into the U.S. financial system and other illicit financial networks.

2. The amounts of money involved, over $20 million and, the fact that it was acknowledged by the U.S Government that the money involved was proceeds of narcotics trafficking based on the charging of violation of 21 USC 841 and 846 as the SUA for the money laundering conspiracy violation indicate to me, based upon my education, knowledge, and, experience that the narcotics trafficking organization(s) (Mexican Cartel(s)) involved in

---

[35] Drug Enforcement Administration, Press Release, *Seven Defendants Charged for Laundering Over $28 Million for DTO*, (July 21, 2021), available at https://www.dea.gov/press-releases/2021/07/21/seven-defendants-charged-laundering-over-28-million-dto

[36] *See* note 29 *supra.*

[37] *Id.*

**Ying Sun Affidavit**

Mexico had to have an incredible scope of operations to cover 23 different U.S. states and generate over $20 million dollars in illicit narcotic proceeds in a one-year-period.

3.  It is my opinion, based upon my education, knowledge, and experience, review of the 2020 NDTA and Congressional testimony, that the Mexican Cartels and drug trafficking organizations the Ying Sun Money Laundering Organization, and Ying Sun individually, laundered money for was either, or both, the Sinaloa or CJNG Cartel.

4.  Based on the totality of the information that I reviewed as part of the Ying Sun prosecution, available open-source information, and as stated above, it is my opinion, based upon my review of the evidence, my education, knowledge, and training, that the Ying Sun Criminal Money Laundering organization, and Ying Sun individually, were operating in the United States as an agency or instrumentality of either, or both, the Sinaloa or CJNG Cartels.

5.  It is my opinion, based upon my review of the evidence, my education, knowledge, and training that the extensive cooperation between the Juárez and Sinaloa Cartels is not limited to planning and execution of the attacks on November 4, 2019, that resulted in the Plaintiffs massacre. The Juárez, Sinaloa, and CJNG Cartels knowingly utilize the same Chinese Money Laundering Organizations ("CMLOs"), such as Ying Sun's, to launder their narcotics proceeds. There are only a limited few CMLOs such as Ying Sun's capable of operating in over 23 states and handling over $20 million dollars. Therefore, it is my opinion based upon my education, knowledge, and training that the Juárez Cartel and its agencies or instrumentalities Sinaloa and CJNG Cartels simultaneously, knowingly, and explicitly utilize the same CMLOs, such as Ying Sun's, to launder and envelop their narcotics proceeds.

**Ying Sun Affidavit**

6.  Therefore, it is my opinion, based upon my review of the evidence, my education, knowledge, and training, that the Ying Sun Criminal Money Laundering organization, and Ying Sun individually, was operating in the United States as an Agency or Instrumentality of the Juárez Drug Cartel.

## Ying Sun Affidavit

I declare that the foregoing is true and correct.

Executed this 28th day of December 2023.

By: _____
    Paul K. Craine